UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERTO FRANCISCO MENDOZA,

              Petitioner,

    v.

KIM HOLLAND,

              Respondent.

Case No. 15-cv-05620-EMC

**ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Roberto Francisco Mendoza filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court convictions for sex offenses against minors. Respondent has filed an answer to the petition and Mr. Mendoza has filed a traverse. For the reasons discussed below, the petition will be granted as to the *Miranda* claim and related ineffective assistance of counsel claims for the convictions in counts 6-11, and the petition will be denied as to all other claims.

## II.    BACKGROUND

A.    State Court Proceedings

The California Court of Appeal described the evidence at trial:

> *Counts Six, Seven and Eight—Victim Jane II*
>
> Jane II's mother testified that her daughter was born in April 1998. The family lived in Seaside from the beginning of 2009 until June 2010. Jane II took Tae Kwon Do lessons at Seaside Martial Arts studio; appellant was Jane II's instructor. After the family moved out of state, Jane II asked her mother how she would know if she had been sexually molested; Jane II was visibly upset at the time. Jane II told her mother that while she was in her martial arts class, appellant had touched her. While telling her mother this, Jane II was "shaking, and she started crying."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jane II testified that she was 14 years old at the time of the trial. When she lived in Seaside she was in fifth grade; she took Tae Kwon Do lessons for seven or eight months.  At times, appellant would assist her with her stretching exercises.  Using a diagram, Jane II indicated that appellant touched her vagina and her breasts over her clothes with his hands while he was helping her stretch. Jane II described the touches as a "petting" motion.  She said the first two touches occurred one week apart and that appellant touched her chest on more than one occasion.  Jane II estimated that appellant touched her vagina more than 10 times.  The touches occurred in the studio next to a pillar while other people were in the studio.  Jane II testified that while she was being touched she tried to make eye contact with other people that were in the studio, but no one was watching her.  She admitted that some of the touches occurred while her mother was present in the studio.  Jane II said she was afraid to tell her mother what was happening while the family lived in Seaside.

*Counts Nine, 10 and 11—Victim Jane III*

Jane III's mother testified that her daughter was born in January 2003.  In 2007 and 2008, appellant and his wife lived with her and her family; appellant and his wife moved out of her house in March 2008.  Jane III's mother testified that she was a nurse and worked a night shift.  Appellant and his wife looked after Jane III and Jane III's brother while she was at work.  The children complained to her about appellant and his wife being present in the home for a few months before appellant and his wife left.

Jane III, who was nine years old at the time of trial and in the third grade, testified that she took Tae Kwon Do lessons from appellant; she called him "master."  Appellant moved in with her family.  She told the jury that appellant gave her "bad touches."  Jane III used a diagram to show where appellant touched her.[2]  She said that appellant touched her over her clothing; she said appellant's finger "slid" over her body.  Jane III said that appellant made her touch his "private part," which was "hairy"; she touched it "a few times." These touches occurred inside appellant's bedroom; the door was locked so at times Jane III was unable to get away from appellant. Jane III described how appellant "played with himself" in front of her; he would "pull" his private parts with his hands while his pants were down.  Jane III testified that she told her counselors about the touches.  Jane III explained that she had not told her mother about the touching because "the story was sad" and she was scared.  Also, appellant had told her not to tell anyone.

> [footnote 2:]  Jane III did not describe what area she had circled.  However, the verdict form for count nine indicates that the lewd act involved appellant touching Jane III's vagina.

*Counts One, Two, Three, Four, and Five—Victim Jane I*

Jane I's father testified that his daughter was born in September 1996.  In 2009, Jane I took Tae Kwon Do classes from appellant.

Jane I took classes for four years. In January 2011, Jane I told him that appellant had touched her inappropriately.

At the time of trial, Jane I said that she was 15 years old. She testified she had attended Tae Kwon Do classes five or six times a week. In April 2009, appellant began commenting on her body as it was developing. One day, while she was in the bathroom checking her weight, appellant closed the bathroom door and grabbed her; he kissed her on the lips. She managed to open the bathroom door and run out; she began crying. The next day, appellant forced her to kiss him on the lips after again closing the bathroom door.

Jane I said that in November 2009, she was in appellant's office when he unzipped her jacket and pulled her shirt and bra down. Appellant fondled her breasts and kissed them. Appellant put his hands down her pants, under her underwear and touched her vagina. Appellant's fingers entered her vagina. Appellant tried to spread her legs when she closed them; she ran out of the office.

Jane I testified that between April and November 2009, appellant touched her vagina over her clothes numerous times. The touches would occur while she was stretching her legs; appellant would push on her vagina. Jane I estimated that appellant touched her vagina while she was stretching on more than 15 occasions. Jane I said that appellant had told her to not tell anyone about the touches. Jane I testified that appellant had said that he had nicknamed her bubbles because of her body. Jane I explained that she was scared to report what was happening; appellant had told her that the studio would close down if she ever reported what was happening and it would be her fault. Jane I said that she had made a pretext telephone call to appellant while a Detective Meroney was present.

Seaside Police Detective Jackie Meroney testified that she had investigated approximately 35 child sexual abuse cases in her career. She had conducted approximately 18 interviews of child sexual abuse suspects and approximately 30 interviews of child sexual abuse victims. In her experience, it is common for victims to delay reporting. Often, the child victims cite fear as a cause for any delay in reporting; fear of not being believed, fear of disappointing their families or fear because of threats made by the perpetrator. Sometimes, the child victims initially provide few details out of fear, and may return to reside with their abuser following the abuse. In her experience, Detective Meroney found that the abuser was a family member or a close family friend with access to the victim. In some cases the abuser used videos, books, or magazines to groom the child victim into committing sexual touches.

Detective Meroney testified that appellant's studio was at the 700 block of Broadway Avenue in Seaside. She identified photographs depicting the front and interior of the studio. On January 13, 2011, she took Jane I's report and recorded a pretext telephone call that Jane I made to appellant. Detective Meroney identified the recording of the pretext telephone call and it was played for the jury. [footnote omitted.]

Detective Gabe Anderson testified that he interviewed appellant on January 13, 2011, following his arrest in this case. Detective Anderson identified the recording of the interview and it was played for the jury. [footnote omitted.]

*Defense Case*

Defense counsel called several witnesses who had trained with appellant at his Tae Kwon Do studio in an attempt to portray Jane I as being an untruthful person. All these witnesses testified that they had never seen appellant touch anyone inappropriately during stretching exercises; some said that they knew Jane I to be untruthful.

Appellant's wife testified that when they lived with Jane III and her family, she looked after the children while Jane III's mother was at work. By the time she and appellant got to the house, the children were in their room sleeping. Appellant never left the bedroom where she and appellant slept and returned to the bedroom with Jane III; the only time he left was to go to the bathroom. Appellant was not alone with the children in the afternoon and he behaved normally around Jane III.

Appellant testified in his own defense. He said that he arrived in the United States in 2002 to work as a Tae Kwon Do instructor. Appellant explained that Jane I had emotional problems and was rebellious about maintaining a fighting weight. One time after successfully weighing in, Jane I came over to him and kissed him on the mouth. He said that it was the only time they kissed. Appellant admitted that in November 2009, while he was discussing with Jane I her readiness to compete, Jane I seemed affectionate so he grabbed her by the shoulders and kissed her on the lips and "maybe her breasts." Appellant said that he put his hand "inside of her pants." Jane I closed her legs when his hand got close to Jane I's vagina. Appellant said that he removed his hand and apologized. Jane I appeared surprised, but not "bothered or worried." Appellant admitted knowing that Jane I was 13 years old at the time he kissed her mouth and breasts. He testified he believed Jane I wanted attention at the time he kissed her.

Appellant admitted helping Jane II with her stretching exercises, but denied putting his hand in the area of her vagina while helping her stretch. Further, he denied ever telling Jane III to touch his body. Appellant said that he touched Jane III's shoulders, hands, and head to get her attention.

*People v. Mendoza*, No. H038547 (Cal. Ct. App. May 1, 2014) ("Cal. Ct. App. Opinion") at 2-6.

Following the jury trial in Monterey County Superior Court, Mr. Mendoza was convicted of eleven counts of committing a lewd or lascivious act on a child under 14 years of age. *See* Cal. Penal Code § 288(a). As to count 4, the jury found that Mr. Mendoza engaged in substantial sexual conduct with the victim. As to counts 5-9, the jury found that Mr. Mendoza committed the

4

offenses against more than one victim.  He was sentenced to 45 years to life plus 18 years in prison.

Mr. Mendoza appealed.  The California Court of Appeal affirmed his conviction in May 2014, and the California Supreme Court denied his petition for review in August 2014.  Mr. Mendoza also filed unsuccessful petitions for writ of habeas corpus in the Monterey County Superior Court, the California Court of Appeal and the California Supreme Court.

B.    Federal Court Proceedings

After his direct appeal and state petitions for writ of habeas corpus were unsuccessful, Mr. Mendoza filed this action, seeking a federal writ of habeas corpus.  Mr. Mendoza alleges the following claims for relief in his federal petition:  (1) his pretrial statement to police was improperly admitted at trial because (a) his *Miranda* rights were violated and (b) the prosecution suppressed the video and transcript in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963); (2) trial counsel provided ineffective assistance of counsel by failing to investigate the *Miranda* claim; (3) Mr. Mendoza was denied a meaningful opportunity to present a defense when the prosecution failed to timely inform the defense about an expert witness and the trial court failed to grant a continuance to counter that expert witness; (4) appellate counsel provided ineffective assistance of counsel by failing to raise Claims 1-3 on appeal; (5) the Judicial Council of California Criminal Jury Instruction (CALCRIM) No. 1110 jury instruction negated a necessary element from the crime of committing a lewd or lascivious act; (6) the trial court failed to *sua sponte* instruct the jury that Detective Meroney's testimony could not be used to determine whether the victim's molestation claims were true, and trial counsel was ineffective for failing to request that instruction; and (7) the cumulative effect of the errors in Claims 5 and 6 violated petitioner's right to due process.

The Court reviewed the petition and ordered Respondent to show cause why the petition should not be granted.  Docket No. 10.

Respondent moved to dismiss the action, arguing that Mr. Mendoza is precluded from obtaining federal habeas relief on Claims 1-3 because the claims are procedurally barred.  Mr. Mendoza did not dispute that his claims had been denied pursuant to an independent and adequate

state procedural rule; instead, he argued that he should be excused from the procedural default because he could demonstrate cause and prejudice due to the ineffective assistance of counsel. The Court determined that Claims 1-3 were procedurally defaulted because they had not been raised on direct appeal and thus ran afoul of the state rule that habeas may not be used as a substitute for an appeal. Docket No. 17. However, the Court reserved for later determination the issue whether Mr. Mendoza could establish cause and prejudice to excuse the procedural default because Respondent had not yet provided the relevant portions of the state court record. Docket No. 20 at 3. (This order reaches that cause-and-prejudice question and resolves it in Mr. Mendoza's favor.)

Respondent has filed an answer to the petition, and Mr. Mendoza has filed a traverse. The matter is now ready for decision.

### III.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Monterey County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV.    STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016). Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default and applies to decisions on the merits. *Barker*, 423 F.3d at 1092 n.3. In other words, when the last reasoned decision is a decision on the merits, the habeas court can look through later summary denials to apply § 2254(d) to the last reasoned decision.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have

1   supported, the state court's decision; and then it must ask whether it is possible fairminded jurists

2   could disagree that those arguments or theories are inconsistent with the holding in a prior

3   decision of [the U.S. Supreme] Court." *Id.* at 102.

## V.    DISCUSSION

5   Mr. Mendoza alleges the following claims for relief in his federal petition for writ of

6   habeas corpus:  (1) his pretrial statement to police was improperly admitted at trial because (a) his

7   *Miranda* rights were violated and (b) the prosecution suppressed the video and transcript in

8   violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963); (2) trial counsel provided ineffective

9   assistance of counsel by failing to investigate the *Miranda* claim; (3) Mr. Mendoza was denied a

10  meaningful opportunity to present a defense when the prosecution failed to timely inform the

11  defense about an expert witness and the trial court failed to grant a continuance to counter that

12  expert witness; (4) appellate counsel provided ineffective assistance of counsel by failing to raise

13  Claims 1-3 on appeal; (5) the CALCRIM No. 1110 jury instruction negated a necessary element

14  from the crime of committing a lewd or lascivious act; (6) the trial court failed to *sua sponte*

15  instruct the jury that Detective Meroney's testimony could not be used to determine whether the

16  victim's molestation claims were true, and trial counsel was ineffective for failing to request that

17  instruction; and (7) the cumulative effect of the errors in Claims 5 and 6 violated petitioner's right

18  to due process.

19  This order addresses the claims in a different order from that presented by Mr. Mendoza.

20  The court first discusses Claims 5-7, and then tackles Claims 1-4.  The latter group of claims

21  involve certain issues that will be better understood if the former group of claims is resolved first.

22  A.    CALCRIM No. 1110 Instructional Error Claim (Claim 5)

23  Mr. Mendoza contends that his right to due process was violated because the jury was

24  instructed with CALCRIM No. 1110, which (according to him) "negated the need for the jury to

25  find all elements" of lewd and lascivious conduct under California Penal Code § 288(a) proven

26  beyond a reasonable doubt.  Docket No. 2 at 6, 96.

27  1.    State Court Proceedings

28  California Penal Code § 288(a) provides, in relevant part:  "[A]ny person who willfully

and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member

thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or

gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony."

At Mr. Mendoza's trial, the jury was instructed with CALCRIM No. 1110, a pattern jury

instruction, for the § 288(a) offense:

> The defendant is charged with eleven separate counts of with [sic]
> committing a lewd or lascivious act on a child under the age of 14
> years in violation of Penal Code section 288(a).
>
> To prove that the defendant is guilty of this crime, the People must
> prove that:
>
> 1A. The defendant willfully touched any part of a child's
> body either on the bare skin or through the clothing;
>
> OR
>
> 1B. The defendant willfully caused a child to touch her own
> body, the defendant's body, either on the bare skin or through the
> clothing;
>
> 2. The defendant committed the act with the intent of
> arousing, appealing to, or gratifying the lust, passions, or sexual
> desires of himself or the child;
>
> AND
>
> 3. The child was under the age of 14 years at the time of the
> act.
>
> *The touching need not be done in a lewd or sexual manner.*
>
> Someone commits an act willfully when he or she does it willingly
> or on purpose. It is not required that he or she intend to break the
> law, hurt someone else, or gain any advantage.
>
> Actually arousing, appealing to, or gratifying the lust, passions, or
> sexual desires of the perpetrator or the child is not required.
>
> It is not a defense that the child may have consented to the act.

CALCRIM No. 1110 (Spring 2012 ed.); RT 2756-57 (italics added).

Mr. Mendoza argued on appeal (as he does in his federal habeas petition) that the italicized

sentence in the jury instruction directly conflicted with the express statutory language defining the

nature of the crime of lewd acts upon a child and therefore negated an essential element of the

crime. He urged that the instruction was infirm because it allowed a conviction without finding an

essential element of the offense, i.e., that the touching had been done lewdly. He further urged that the error was not harmless because his facts are unusual: as a martial arts instructor, he had touched the victim, as he touched all his students, to help with stretches. *See* Docket No. 2 at 96-97.

The California Court of Appeal rejected Mr. Mendoza's arguments, concluding that the instruction was a correct statement of California law.

> The language of CALCRIM No. 1110 comports with the statutory elements of the offense of lewd or lascivious act on a child. In discussing the definition of a "lewd" act under section 288, the Supreme Court has explained the "statute itself declares that to commit such an act 'wilfully and lewdly' means to do so 'with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires' of the persons involved." (*In re Smith* (1972) 7 Cal.3d 362, 365 (*Smith*).) The focus of the offense is on the intent of the perpetrator. "[T]he courts have long indicated that section 288 prohibits all forms of sexually motivated contact with an underage child. Indeed, the 'gist' of the offense has always been the defendant's intent to sexually exploit a child, not the nature of the offending act. [Citation.] '[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done.... If [the] intent of the act, although it may have the outward appearance of innocence, is to arouse ... the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute....' [Citation.]" (*People v. Martinez* (1995) 11 Cal.4th 434, 444 (*Martinez*).)
>
> The sentence to which appellant objects correctly states the law and makes it plain to the jury the physical act of touching involved need not be seen as lewd or offensive in and of itself. Even a physical touching that may appear innocent, if done with the requisite statutory intent, can be found to be a prohibited act under section 288. "As suggested in [*In re ] Smith*, we can only conclude that the touching of an underage child is 'lewd or lascivious' and 'lewdly' performed depending entirely upon the sexual motivation and intent with which it is committed." (*Martinez, supra*, 11 Cal.4th at p. 449; accord, *People v. Lopez* (1998) 19 Cal.4th 282, 289 [any touching of a child under the age of 14 violates section 288, subdivision (a), even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the intent to arouse or gratify the sexual desires of either the perpetrator or the victim]; see also *People v. Sigala* (2011) 191 Cal.App.4th 695, 700–701 [holding same language in CALCRIM No. 1120 to be correct statement of law].) In short, CALCRIM No. 1110 does not improperly negate a statutory element of section 288.
>
> . . .

10

> We reject appellant's argument that the evidence as to counts six, seven and eight involving Jane II was ambiguous in terms of the sexual or lewd nature of the contact. Jane II testified that appellant touched her vagina and breasts. In our view, this behavior was explicitly sexual; we have no doubt the jury found the behavior was explicitly sexual.
>
> In sum, CALCRIM No. 1110 as given in this case correctly stated the law and did not remove an element of the offense from the jury's consideration.

Cal. Ct. App. Opinion at 8-11. The California Court of Appeal acknowledged that CALCRIM No. 1110 was revised in 2013 (i.e., a year after Mr. Mendoza's trial) to delete the challenged sentence, but that revision did "not alter [the appellate court's] assessment of the validity of CALCRIM No. 1110 as given in this case. There has been no change in the well-established law that a violation of section 288 does not require an explicitly sexual or inherently lewd touching." Cal. Ct. App. Opinion at 9-10.

2.     Analysis

To obtain federal habeas relief for an error in the jury instructions, a petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). A jury instruction violates due process if it fails to give effect to the requirement that "the State must prove every element of the offense." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). "'A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)). "Even if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation." *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Middleton v. McNeil*, 541 U.S. at 436). Where an ambiguous or potentially defective instruction is at issue, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S at 72 & n.4; *Boyde*, 494 U.S. at 380. If a constitutional error is found in the jury instructions, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

The California Court of Appeal's rejection of Mr. Mendoza's instructional error claim was

not contrary to, or an unreasonable application of, clearly established law from the U.S. Supreme Court. The appellate court determined that the instruction correctly stated California law that the touching need not be inherently lewd or offensive, and that a violation occurs if the defendant commits the act with the intent of arousing, appealing to, or gratifying the lust or sexual desires of one or both of the persons involved. The California Court of Appeal rejected Mr. Mendoza's interpretation of the statute as a matter of state law. The California Court of Appeal's interpretation of California law is binding in this federal habeas action. *See Hicks v. Feiock*, 485 U.S. 624, 629-30 (1988). That is, this Court's analysis begins with an acceptance that the law of California is that a § 288(a) offense may occur even if the touching is not itself done in a lewd or sexual manner. And this Court's analysis begins with an acceptance that the law of California is that a § 288(a) offense occurs if the defendant commits the act with the intent of arousing, appealing to, or gratifying the lust of sexual desires of one or both the persons involved. Here, those determinations of state law mean that the premise of Mr. Mendoza's challenge to the instruction is wrong. That is, the jury did not have to find that the touching had to be done in a lewd manner even though the § 288(a) offense makes criminal certain "lewd and lascivious acts."

Given that the touching need not be done in a lewd manner, Mr. Mendoza's due process claim fails because his premise is wrong. He contends that the jury instruction impermissibly negated the need for the jury to find the element that the touching was done lewdly, but California law does not have such an element for this crime. For the jury to find the defendant guilty, the instruction required the jury to find that (a) the defendant touched the child's body or caused the child to touch her own or defendant's body, and (b) "[t]he defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child." CALCRIM No. 1110. That was enough under state law. As the state court of appeal reasonably determined, Mr. Mendoza's argument that innocent conduct could support a conviction fails because of the instruction's requirement that the "defendant commit[] the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child."

This Court concludes that there is no reasonable likelihood that the use of CALCRIM No. 1110 eliminated the need for the prosecutor to find all elements of the § 288(a) offense proven

beyond a reasonable doubt. Several other district courts also have so held. *See, e.g., Fijar v. Madden*, 2016 WL 8737749, at *5-6 (C.D. Cal. 2016) (petitioner not entitled to federal habeas relief because CALCRIM No. 1110 was a correct statement of state law, as the state appellate court had determined that the offense did not require proof of touching in a lewd manner); *Franklin v. Davis*, 2015 WL 10583503, at *10-11 (C. D. Cal. 2015) (same); *Barnard v. Busby*, 2014 WL 1512031, at *18 (C.D. Cal. 2014) (CALCRIM No. 1110 "did not relieve the prosecution of its burden to prove every element of the charged offenses" because, contrary to petitioner's argument, state law has been interpreted not to require that the "form, manner or nature of the touching itself" be lewd); *Healan v. Gipson*, 2011 WL 3962084, at *7-8 (C. D. Cal. 2011) (CALCRIM No. 1110 did not relieve the prosecution of burden to prove every element of charged offense because, as state court had determined, § 288(a) did not require that the touching be done in a lewd manner).

Mr. Mendoza has not shown any instructional error, let alone one that "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). He is not entitled to the writ on this claim.

B.    Detective Meroney's Testimony (Claim 6)

Seaside Police Detective Meroney, one of the investigators, testified about certain commonalities she had seen in her years of experience investigating child sexual abuse claims. Mr. Mendoza contends that the trial court's failure to instruct that her testimony could not be used as proof the victims were truthful violated his right to have the jury determine witness credibility. He further argues that, if such an instruction could be given only on counsel's request, counsel was ineffective for failing to request the instruction. [1]

1.    Proceedings In Trial Court

Detective Meroney worked for the Seaside Police Department and did some of the

---

[1] Mr. Mendoza also urges in his petition that his constitutional right to present a defense was denied when the prosecutor tardily designated Detective Meroney as an expert and the trial court did not grant a continuance to the defense to prepare for that expert. Respondent argues that this claim is procedurally defaulted because it was not presented on direct appeal. This right-to-present-a-defense claim will be discussed in the procedural default section later in this order.

investigation in the case against Mr. Mendoza. Detective Meroney was on the original witness list but was not listed as an *expert* witness. Once the proceedings were underway (and while the court was conducting voir dire for jury selection), the prosecutor attempted to designate Detective Meroney as an expert about child sexual abuse claims. CT 145-46. The defense objected. CT 152-56. At a hearing outside the presence of the jury, the court denied the prosecution's request to qualify Detective Meroney as an expert in child sexual abuse claims, or as an expert in the Child Sexual Abuse Accommodation Syndrome. CT 148-49. At trial, no mention was made of the Child Sexual Abuse Accommodation Syndrome (CSAAS) and Detective Meroney did not testify as an expert witness on CSAAS or as an expert on any other topic.

Detective Meroney did testify about common occurrences she had seen in her experience investigating more than 35 sexual assault cases during her career. Detective Meroney testified that, in her experience, there were certain "commonalities" with children who were victims of sexual assault: the majority of cases involved delayed reporting by the victims, sometimes months or years after the abuse; victims sometimes did not report their abuse when they had the opportunity to do so; victims sometimes did not report because of fear (of not being believed, of being a disappointment to their families, or due to statements made by the suspect); some victims made inconsistent statements and remembered more things at a later date or were afraid to say things right away; some victims returned to their abusers or the situation where the abuse occurred; the abusers sometimes had regular access to the victims; and the perpetrators sometimes would try to introduce sexuality to the victim or increase the sexuality of the victim (e.g., by showing images, then demonstrating what is touching of a sexual nature, and later moving on to doing the actual touching). *See* RT 1888-92. Detective Meroney also admitted that these commonalities were not always present; for example, perpetrators did not always show images to victims before touching them, RT 1893.

On cross-examination, Detective Meroney admitted that not all victims delayed in reporting, RT 2109; some people reported abuse as soon as they had the opportunity to do so, RT 2109; and some people never returned to the suspected abuser and had nothing further to do with the suspected abuser, RT 2110. Detective Meroney also testified that it was not really her job to

14

1    determine whether the children were telling the truth in their reports and that she was just

2    conducting the investigation.  RT 2110-11.  She also agreed that the fact that a person delayed in

3    reporting did not make that person's accusation any more likely to be true than if there was no

4    delay in reporting, and she agreed that the fact that someone did not disclose the abuse at the

5    earliest opportunity did not make the accusation any more likely to be true.  RT 2111.

6          The foregoing testimony about "commonalities" gives rise to Mr. Mendoza's claims.

7    (Detective Meroney also testified that she was present when Jane I made her pretext call to Mr.

8    Mendoza and testified about the layout of Mr. Mendoza's studio as it existed when she executed a

9    search warrant, but those portions of her testimony are not at issue.)

10         2.    California Court of Appeal Rejects Claims Of Instructional Error And Ineffective

11               Assistance of Counsel

12         On appeal (as in his federal habeas petition), Mr. Mendoza argued that the trial court erred

13   in failing to instruct the jury that detective Meroney's testimony about commonalities could not be

14   used to determine whether molestation claims were true and could only be used "to decide

15   whether the complaining witnesses' conduct was not inconsistent with the conduct of person[s]

16   who had been molested."  Docket No. 2 at 108.  He further argued that this failure to instruct

17   violated his Sixth and Fourteenth Amendment rights to have the jury determine witness

18   credibility.  Docket No. 2 at 113.  He also argued that, if the defense had to request such an

19   instruction for the court to have a duty to give it, his counsel provided ineffective assistance in not

20   requesting the instruction.

21         The California Court of Appeal rejected Mr. Mendoza's claims on the ground that any

22   error was harmless.  Before turning to the harmlessness analysis, the state appellate court observed

23   that the trial court did not qualify Detective Meroney as an expert witness and that CSAAS was

24   not mentioned during her testimony, although Detective Meroney was allowed to testify to her

25   experiences and testified about some commonalities among the cases she had investigated.

26         Also before turning to the harmlessness analysis, the state appellate court discussed

27   CSAAS expert testimony, explaining that "[e]xpert testimony concerning CSAAS is used to

28   describe and explain how children commonly react to sexual molestation" in ways that may seem

                                          15

1   counter-intuitive, e.g., delays in reporting the sexual abuse.  Cal. Ct. App. Opinion at 12.  Such

2   expert testimony "'is not admissible to prove that the complaining witness has in fact been

3   sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant

4   suggests that the child's conduct after the incident -- e.g., a delay in reporting—is inconsistent with

5   his or her testimony claiming molestation.'"  Cal. Ct. App. Opinion at 12 (quoting *People v.*

6   *McAlpin*, 53 Cal. 3d 1289, 1300 (1991)).  When there is *expert* testimony on CSAAS, the trial

7   court must sua sponte instruct the jury "'that (1) such evidence is admissible solely for the purpose

8   of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having

9   been molested; and (2) the expert's testimony is not intended and should not be used to determine

10  whether the victim's molestation claim is true.'"  Cal. Ct. App. Opinion at 13 (quoting *People v.*

11  *Housley*, 6 Cal. App. 4th 947, 959 (Cal. Ct. App. 1992).  The purpose of the instruction "is to

12  avoid misuse of CSAAS testimony and the expert inadvertently corroborating the victim's claim

13  'because the expert commonly is asked to offer an opinion on whether the victim's behavior was

14  typical of abuse victims, an issue closely related to the ultimate question of whether abuse actually

15  occurred.'"  *Id.* (quoting *Housley*, 6 Cal. App. 4th at 958)).

16       The California Court of Appeal observed that Detective Meroney was not asked to offer an

17  opinion on whether any of the three victims' behavior was typical of an abuse victim.

18  Nonetheless, the state appellate court thought her testimony about her experiences "could be

19  construed as showing the victims' reactions as demonstrated by the evidence were typical of abuse

20  victims."  *Id.*  The present situation -- where CSAAS expert testimony had not actually been

21  given, but general testimony was given about the common behaviors of children who had been

22  sexually abused -- differed from that in which a duty to instruct had been found.  The Court of

23  Appeal concluded it was unnecessary to decide whether to extend the requirement for a limiting

24  instruction to the situation where testimony about commonalities was given by a nonexpert

25  because any failure to do so was harmless error in Mr. Mendoza's case.

26           First, we note that the court instructed the jury "[y]ou alone must
             judge the credibility or believability of the witnesses."  Any risk that
27           Detective Meroney's testimony would be mistaken by the jury as
             support for the victim's credibility was eliminated by her testimony
28           that she is obligated to take a child victim's report, but she does not

determine credibility and that the fact a child victim immediately reports or delays a report does not establish their credibility—in other words these things could not be used to corroborate the victims' claims. In light of these comments, the jury would not reasonably have understood Detective Meroney's testimony as being offered for the purpose of corroborating the victims' claims of molestation.

Furthermore, this case did not turn on delayed reporting, but rather on whether what Jane II and Jane III said happened was possible in light of the public nature of the molestation to Jane II; and as to Jane III the fact that the molestation was alleged to have occurred in the bedroom that appellant shared with his wife, during a time when it was highly probable his wife was present in the room.

. . . After an examination of the entire case, including the evidence, we conclude there is not a reasonable probability that a result more favorable to appellant would have been reached had the cautionary instruction regarding Detective Meroney's testimony been given. (*People v. Watson, supra*, 46 Cal.2d 818, 835–836 [Cal. 1956)]; *People v. Housley, supra*, 6 Cal.App.4th at p. 959.) Jane II and Jane III each provided detailed testimony regarding various molestations perpetrated on them by appellant. Contrary to appellant's assertions, nothing in Jane II's and Jane III's testimony was inherently improbable.

Having determined this error was harmless, we need not address appellant's contention that his counsel provided ineffective assistance by failing to request a limiting instruction, since appellant cannot show he was prejudiced by counsel's error. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217, [defendant must establish prejudice to obtain relief on an ineffective assistance claim].)

Cal. Ct. App. Opinion, at 14-15.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92. Mr. Mendoza is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

3.    Analysis of Federal Constitutional Claims

a.    Instructional-Error Claim

Federal habeas relief is available for the omission of a jury instruction only if the error "'so infected the entire trial that the resulting conviction violate[d] due process.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see Estelle v.*

*McGuire*, 502 U.S. 62, 72 (1991). Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v.* Evans, 456 U.S. 605, 611 (1982). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155).

If a constitutional error is found in the omission of an instruction, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998). The habeas court must apply the harmless-error test set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 623). When, as here, the state court has found the error harmless, federal habeas relief is not available for the error "unless *the harmlessness determination itself* was unreasonable." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (emphasis in original). In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. at 103).

Here, the state appellate court's determination that any instructional error was harmless was not contrary to, or an unreasonable application of, clearly established law from the U.S. Supreme Court. The assumed error is the trial court's failure to instruct the jury that it could not use Detective Meroney's testimony about commonalities she had seen in child sexual abuse cases as proof that the victims here were truthful. The failure to give that instruction had no impact on the verdict for several reasons, as the California Court of Appeal reasonably determined.

First, the other instructions conveyed to the jury that it alone was to determine witness credibility and believability. The jurors were instructed: "You must decide what the facts are. It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial." CT 295. The jurors also were instructed to "[p]ay careful attention to all of these instructions and consider them together." RT 296. The jurors also were instructed that lay witnesses had given opinion testimony, and that the jurors "may but are not

18

1    required to accept those opinions as true or correct.  You may give the opinions whatever weight

2    you think appropriate."  RT 320.  The instructions given did not lead the jury to give any extra

3    weight to Detective Meroney's testimony or lead the jury to assume she was vouching for the

4    truthfulness of the victims.  The instructions, considered as a whole, instead directed the jury that

5    it (i.e., the jury) rather than any witness was supposed to decide who to believe and to decide what

6    happened.

7          Second, as the state appellate court explained, any risk that Detective Meroney's testimony

8    would be mistaken as supporting the victims' credibility was eliminated by her testimony that she

9    was just a report-taker and not an evaluator of truthfulness.  *See* RT 2110-11 (Q:  "It's not really

10   your job [when taking down information from people reporting crimes] to determine whether or

11   not what they're saying is true.  You're simply conducting an investigation, right?  A:  Correct.")

12   As the state appellate court reasonably determined, the jury would not have understood from these

13   instructions and this testimony that Detective Meroney's testimony was offered to corroborate the

14   victims' claims of molestation.  Detective Meroney also was never asked whether she believed

15   any of the victims.

16         Third, the commonalities to which Detective Meroney had testified really were not the

17   focus in this action.  As the state appellate court reasonably concluded, the case did not turn on

18   delayed reporting, or any credibility issues related to delayed reporting, but instead on whether the

19   molestation of Jane II was possible given that it allegedly occurred in a public space with many

20   witnesses (including Jane II's mother) being nearby and whether the molestation of Jane III was

21   possible given that it allegedly occurred in Mr. Mendoza's bedroom at a time when it was likely

22   that Mrs. Mendoza would have been present.  It was not unreasonable for the state appellate court

23   to determine that the testimony of Jane II and Jane III was not inherently improbable.[2]

24         Although the California Court of Appeal did not discuss the closing arguments, those

25   arguments provide further support for a finding that any instructional error was harmless.  The

26

27                   
     [2] Like the California Court of Appeal, this Court only discusses Jane Doe II and Jane Doe III
28   because the error was asserted only as to the convictions for crimes against them.  *See* Docket No.
     2 at 80.  Error was not asserted as to the convictions for crimes against Jane Doe I.

prosecutor did not overly emphasize the commonalities among children reporting sexual abuse as testified to by Detective Meroney. The prosecutor did argue that there were commonalities for these three victims that were consistent with Detective Meroney's testimony about commonalities in child sexual abuse cases -- e.g., late reporting, missed opportunities to disclose the sexual abuse earlier, the victims appeared to have a positive relationship with the suspect, and the suspect appeared to have gained their trust -- but this was not a central theme of the closing argument. *See* RT 2820-21.[3] Moreover, defense counsel successfully blunted any potential negative impact of Detective Meroney's commonalities testimony in his closing argument. Defense counsel argued:

> There are other witnesses, and that includes Detective Meroney. She testified the first time she got up on the stand about what she said were commonalities. [¶] "I've seen in my experience sometimes these things happen. Sometimes there's a late report. Sometimes they go back to the person that supposedly did these things to them." [¶] And then what she testified to on cross is there's also cases where that doesn't happen. [¶] The sum total of that is it's irrelevant. Sometimes it happens. Sometimes it doesn't. None of it gets you closer to whether or not what those people are saying happened to them is true or not.

RT 2810. This argument countered any probative force in Detective Meroney's testimony about commonalities she had observed in her years of experience. In short, by showing the jury that the witness had conceded that these commonalities among those children reporting sexual abuse were often present but also were often absent, defense counsel made a strong point that the nonexpert's commonalities evidence was essentially useless to the jury in deciding whether the defendant was guilty. Under the circumstances, the jury would likely have seen Detective Meroney's testimony about commonalities as anecdotal information that provided no useful tool for evaluating the complaints that Mr. Mendoza had sexually abused these three victims.

Finally, the jury deliberations were somewhat limited. The jury deliberated for less than

---

[3] The prosecutor also commented on other commonalities, but these were the features common to each of these three victims, and not commonalities with other children reporting sexual abuse. *See* RT 2816-17 (discussing the common features in the three victims here, i.e., each was a child student in Mr. Mendoza's Tae Kwon Do class, each was touched on vaginal area over her clothing, each was touched on her breasts, two were touched during stretching routines, and each victim's parents trusted the defendant). These were not the commonalities testified to by Detective Meroney that give rise to this habeas claim.

20

1    seven hours after five days of trial in which there were eleven counts involving three separate

2    victims.  See CT 157-188.  The jury sent no questions to the court other than to ask about how to

3    fill out a portion of the verdict form if it found the defendant guilty.  CT 291.  "'Longer jury

4    deliberations weigh against a finding of harmless error because lengthy deliberations suggest a

5    difficult case.'"  *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) (quoting *United States*

6    *v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)); *see, e.g., id.* at 846 (2.5-hour jury

7    deliberations in illegal reentry case suggested any error in allowing testimony or commentary on

8    defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (4-day jury

9    deliberations supported inference that impermissible evidence affected deliberations).  The jury

10   returned verdicts on all eleven counts against Mr. Mendoza and did so in less than seven hours.

11   The short deliberations suggest the jury did not struggle with this case and weigh in favor of

12   finding that any instructional error was harmless.

13        The state appellate court's harmlessness determination was not "'so lacking in justification

14   that there was an error well understood and comprehended in existing law beyond any possibility

15   for fairminded disagreement.'"  *Davis v. Ayala*, 135 S. Ct. at 2199 (quoting *Harrington*, 562 U.S.

16   at 103).  Mr. Mendoza is not entitled to the writ on this claim.

17                    b.    The Ineffective-Assistance Claim Falls With Instructional-Error Claim

18        Mr. Mendoza also argued on appeal (and here) that if it was necessary for counsel to

19   request a limiting instruction about Detective Meroney's commonalities testimony in order for the

20   trial court to have a duty to give such an instruction, then his trial counsel was ineffective for

21   failing to request the instruction.  Docket No. 2 at 121.

22        The California Court of Appeal determined that it did not need to address Mr. Mendoza's

23   contention that counsel provided ineffective assistance by failing to request such a limiting

24   instruction because Mr. Mendoza could not show he was prejudiced by counsel's purported error.

25   Cal. Ct. App. Opinion at 15.

26        The Sixth Amendment's right to counsel guarantees not only assistance, but effective

27   assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for

28   judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The relevant inquiry under *Strickland* is not what defense counsel could have done, but rather whether his choices were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

The California Court of Appeal's rejection of Mr. Mendoza's ineffective assistance of counsel claim was a reasonable application of *Strickland*. As the state appellate court intimated, Mr. Mendoza could not establish the prejudice prong of *Strickland* because the failure to give the jury instruction was found to be harmless error. With the omission of the instruction being harmless error, it was reasonable to conclude that there was no reasonable probability that the result of the proceeding would have been different had counsel requested the instruction. The state appellate court was well within reason in concluding that the *Strickland* prejudice prong could not be shown. Mr. Mendoza is not entitled to the writ on this claim.

C.    Cumulative Error Regarding the Foregoing Claims (Claim 7)

Mr. Mendoza contends that the cumulative effect of the use of CALCRIM No. 1110 and the failure to give a limiting instruction on Detective Meroney's testimony was sufficiently prejudicial to warrant federal habeas relief for him.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

22

1   the cumulative effect of several errors may still prejudice a defendant so much that his conviction

2   must be overturned. *See Alcala v. Woodford,* 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing

3   conviction where multiple constitutional errors hindered defendant's efforts to challenge every

4   important element of proof offered by prosecution). "[T]he fundamental question in determining

5   whether the combined effect of trial errors violated a defendant's due process rights is whether the

6   errors rendered the criminal defense 'far less persuasive,' *Chambers* [*v. Mississippi*, 410 U.S. 284,

7   294 (1973)], and thereby had a 'substantial and injurious effect or influence' on the jury's verdict,

8   *Brecht*, 507 U.S. at 637." *Parle v. Runnels,* 505 F.3d 922, 928 (9th Cir. 2007).

9        Here, there were not multiple errors to accumulate for Claims 5 and 6. Like the state

10  appellate court, this Court did not find a constitutional error in the use of CALCRIM No. 1110 and

11  only assumed an error as to the failure to instruct on Detective Meroney's testimony (which it

12  found to be harmless). Without multiple errors, Mr. Mendoza is not entitled to relief under the

13  cumulative error doctrine.

14  D.   Procedural Default

15       Respondent contends that Claims 1-3 of Mr. Mendoza's petition are procedurally

16  defaulted. Claim 1 is that Mr. Mendoza's pretrial statement to police was improperly admitted at

17  trial because (a) his *Miranda* rights were violated and (b) the prosecution suppressed the video and

18  transcript of the police interview in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

19  Claim 2 is that trial counsel provided ineffective assistance by failing to investigate the *Miranda*

20  claim. Claim 3 is that Mr. Mendoza was denied a meaningful opportunity to present a defense

21  when the prosecution failed to timely inform the defense about an expert witness and the trial

22  court failed to grant a continuance to counter that expert witness.

23       To help the reader understand the procedural default analysis, the Court will summarize it

24  first and then fill in the details. In brief, the Court's analysis is as follows: Claims 1-3 are

25  procedurally defaulted because they were not raised on direct appeal, as required by California

26  law. A procedurally defaulted claim may be considered in a federal habeas action if a petitioner

27  shows cause and prejudice for the procedural default. Ineffective assistance of counsel may

28  provide cause to excuse a procedural default, but only if (a) the ineffective assistance amounts to

constitutionally ineffective assistance of counsel, (b) the ineffective-assistance-of-counsel claim was presented as a separate claim in state court, and (c) state court remedies were exhausted for the ineffective-assistance-of-counsel claim.  Mr. Mendoza shows cause to excuse his procedural default as to the *Miranda* claim based on ineffective assistance of trial and appellate counsel.  He does not show cause to excuse his procedural default as to the *Brady* claim and the right-to-present-a-defense claims because those claims are meritless and thus failure to raise them was not ineffective assistance.  The claim for a *Brady* violation and denial of the right to present a defense will be rejected as procedurally defaulted.  The *Miranda* claim and its accompanying ineffective-assistance of counsel claims will be evaluated on the merits.  A more detailed analysis follows.

### 1.   The Procedural Default

A federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.  In these cases, the state judgment rests on independent and adequate state procedural grounds."  *Id.* at 729-30.  A "discretionary state procedural rule can serve as an adequate ground to bar federal habeas review." *Beard v. Kindler*, 558 U.S. 53, 60 (2009).  A state procedural bar is "independent" if the state court explicitly invokes the procedural rule as a separate basis for its decision and the application of the state procedural rule does not depend on a consideration of federal law.  *Vang v. Nevada*, 329 F.3d 1069, 1074-75 (9th Cir. 2003).  An "adequate" state rule must be "firmly established and regularly followed."  *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Kindler*, 558 U.S. at 60-61).  A rule can be "firmly established and regularly followed" even if it is discretionary, and even if the state court may choose to deny a procedurally barred claim on the merits.  *See id.* at 316, 319. The state bears the burden of proving the adequacy of a state procedural bar.  *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003).

Here, the Court earlier found that the claims were procedurally defaulted:

1
2
3
4

> [P]etitioner raised Claims 1-3 in his state habeas petition, and the
> Superior Court dismissed Claims 1-3, with citations to *In re Dixon*,
> 41 Cal. 2d 756, 759 (1953), and *In re Harris*, 5 Cal. 4th 813, 826-27
> (1993). Because the California Supreme Court denied petitioner's
> state habeas petition without comment, it is presumed that the
> California Supreme Court did not disregard the bar and consider the
> merits. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).

5
6
7
8
9
10
11

> In *Harris*, 5 Cal. 4th at 826-27, the California Supreme Court
> specifically stated, "[i]t is well settled that a writ of habeas corpus
> ordinarily may not be employed as a substitute for an appeal."
> Similarly, *Dixon*, 41 Cal. 2d at 759, provides that in order to bring a
> claim in a state habeas corpus action a petitioner must first, if
> possible, have pursued the claims on direct appeal from his or her
> conviction unless the claim falls within certain exceptions. *See Park
> v. California*, 202 F.3d 1146, 1151 (9th Cir. 2000). The *Dixon* rule
> is both an adequate and independent state procedural rule. *Johnson
> v. Lee*, 136 S. Ct. 1802, 1805-06 (2016) (per curiam); *Park*, 202
> F.3d at 1152-53. Thus, because the state court rejected petitioner's
> Claims 1-3 based on *Dixon*, federal habeas review is barred unless
> petitioner can demonstrate cause for his procedural default, and
> actual prejudice as a result.

12    Docket No. 17 at 2-3.[4] Petitioner did not, and does not now, dispute that Claims 1-3 are

13    procedurally defaulted.

14              2.      Ineffective Assistance Of Counsel Provides Cause To Excuse The Procedural

15                      Default As To The *Miranda* Claim

16              Unless a habeas petitioner shows cause and prejudice, the federal habeas court may not

17    reach the merits of procedurally defaulted claims in which the petitioner failed to follow

18    applicable state procedural rules in raising the claims. *See Sawyer v. Whitley*, 505 U.S. 333, 338

19    (1992). The cause standard requires the petitioner to show that "some objective factor external to

20    the defense" or constitutionally ineffective assistance of counsel impeded his efforts to comply

21    with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). To satisfy the

22    prejudice part of the cause-and-prejudice test, the petitioner must show actual prejudice resulting

23    from the errors of which he complains. *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991).[5]

24    _____

25    [4] The superior court decision that imposed the procedural bar is in the record at pages 63, 64 and
      74 of Docket No. 2.

26
27    [5] A federal court also may hear the merits of a procedurally defaulted claim if the failure to hear
      the claim would constitute a "miscarriage of justice." *See Sawyer*, 505 U.S. at 339-40. In the
      federal habeas context, the "miscarriage of justice" exception is limited to habeas petitioners who
      can show that "a constitutional violation has probably resulted in the conviction of one who is
28    actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray v. Carrier*, 477 U.S.

In order for counsel's ineffectiveness to provide cause to excuse a procedural default, the attorney must "be constitutionally ineffective under the standard established in *Strickland v. Washington,*" 466 U.S. 668 (1984). *Murray v. Carrier*, 477 U.S. at 488. Under *Strickland*, a petitioner must establish two things to prevail on a Sixth Amendment ineffective-assistance-of-counsel claim. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland,* 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Appellate counsel's performance also is evaluated using the *Strickland* standard. *See Smith v. Robbins,* 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010) (for deficient performance prong in appellate context, the petitioner must "demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue," and for prejudice prong in appellate context, "petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal"). Attorney error that does not meet the *Strickland* standard does not suffice to provide cause to excuse a procedural default. *Murray v. Carrier*, 477 U.S. at 488.

The AEDPA's deferential standard in 28 U.S.C. § 2254(d) does not apply when a court is determining whether there was ineffective assistance of counsel for purposes of determining whether the cause and prejudice standard is met. *Visciotti v. Martel*, 862 F.3d 749, 768 (9th Cir. 2016), *petition for cert. filed* (U.S. Dec. 1, 2017) (No. 17-6937).[6] Rather, the court independently

---

at 496). Mr. Mendoza does not argue that the miscarriage of justice exception applies to his case.

[6] There is a circuit split as to whether de novo or AEDPA deference is the proper standard of review when a federal habeas court examines whether there is ineffective assistance of counsel that supplies cause to excuse a procedural default. *Visciotti,* 862 F.3d at 769 & n.13.

Respondent argues that there also is a split within the Ninth Circuit on this question and urges the Court to rely on the analysis in *Walker v. Martel*, 709 F.3d 925, 939-44 (9th Cir. 2013). *Walker* did not squarely address the standard of review, unlike *Visciotti.* This Court thus follows the clear holding from *Visciotti* rather than the implicit assumption (but not holding) in *Walker* that AEDPA deference applies to the cause and prejudice analysis.

determines whether there was ineffective assistance of counsel, without any deference to the state court determination on the claim for ineffective assistance of counsel. *Id.*

In addition to meeting the *Strickland* standard, for counsel's ineffectiveness to provide cause, the petitioner must have presented the ineffective-assistance-of-counsel claim as a separate claim to the state courts and exhausted state court remedies for that claim. *Murray v. Carrier,* 477 U.S. at 489.

Here, the alleged ineffective assistance of counsel consisted of both trial and appellate counsel failing to raise the *Miranda*, *Brady* and right-to-present-a-defense claims. It thus is necessary to consider whether there was potential merit to any or all of those claims because counsel does not engage in deficient performance by failing to raise a nonmeritorious issue. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (counsel's performance not deficient for failing to raise meritless objection); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take a futile action can never be deficient performance); *see also Moormann*, 628 F.3d at 1107 (if there is not an underlying error "appellate counsel did not act unreasonably in failing to raise a meritless claim" and petitioner "was not prejudiced by appellate counsel's omission"). As discussed below, counsel was ineffective in failing to raise *Miranda*; it would not have been futile; indeed, as explained below, it was a meritorious claim.

        a.    *Miranda* Claim

Mr. Mendoza contends that his constitutional rights were violated when the court admitted evidence of an out-of-court confession that he made after his invocation of his *Miranda* rights was ignored by the police.

        1.    The Interview

Respondent has provided a DVD containing an audio-video recording of Mr. Mendoza's interview with police, and a transcription of that interview. *See* Docket No. 25-23 at 28-115 and accompanying DVD. The interview lasted about an hour, but the relevant statements occur at the very beginning of the interview. The interview apparently took place at the Seaside police station, and was conducted by Seaside Police Detective Jackie Meroney and Seaside Police Detective Gabe Anderson on January 13, 2011. RT 2166-67; Docket No. 25-23 at 30.

1    The following exchange took place at the outset of the interview, just after the two

2 detectives and Mr. Mendoza sat down for the interview:

3    Meroney:    You can have a seat right there.

4    Mendoza:    Thank you.

5    Meroney:    Okay, so like I said before, I'm Detective Meroney.

6    Mendoza:    Uhm hmm . . . (indicating yes).

7    Meroney:    With the Seaside Police Department. Uhm . . . before
        we speak to you or anything, we're gonna ask you a couple of
8        questions, okay . . . or read you a couple of things.

9    Mendoza:    Yeah . . . (indicating yes).

10    Meroney:    Uhm . . . you have the right to remain silent.
        Anything you say can be used against you in a court of law. You
11        have the right to consult with a lawyer before answering any
        questions, and to have a lawyer with you during any questioning. If
12        you cannot afford a lawyer, one will be provided for you free of
        cost, if you want one. Do you understand?
13

14    Mendoza:    Yes, Ma'am.

15    *Meroney:*    *Do you want to discuss anything with us?*

16    *Mendoza:*    *No way.*

17    *Meroney:*    *No?*

18    *Mendoza:*    *Nah. . . (indicating no).*

19    Meroney:    Do you wanna talk about why you're here?

20    Mendoza:    Well I supposed to, I was, uh, called and my
        student's this morning and ask me if they, that she doesn't want to
21        train anymore . . . .

22 Docket No. 25-23 at 30-31 (transcript at 1-2) (ellipses in source). The interview continued for

23 about an hour after Mr. Mendoza indicated he did not want to discuss anything with the detectives.

24    2.    Analysis

25        a.    A *Miranda* Violation Occurred

26    A person subjected to custodial interrogation must be advised that "he has a right to remain

27 silent, that any statement he does make may be used as evidence against him, and that he has a

28 right to the presence of an attorney." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The

28

warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. *Id.*

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74. Later decisions from the Supreme Court have clarified that the suspect's right to cut off police questioning is triggered only by an unambiguous and unequivocal invocation of either the right to remain silent or the right to counsel. *See Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (right to remain silent); *cf. Davis v. United States*, 512 U.S. 452, 458-59 (1994) (right to counsel also must be unambiguously and unequivocally invoked). For example, remaining "largely silent" for 2-3/4 hours of a 3-hour interrogation was not unambiguous enough to invoke the right to remain silent because the suspect did not say that he wanted to remain silent or that he did not want to talk to the police in *Berghuis*, at 375-76, 381-82, and saying "Maybe I should talk to a lawyer" was not unequivocal enough to invoke the right to counsel in *Davis*, 512 U.S. at 461-62. These ambiguous and equivocal statements and behaviors thus did not require that questioning cease.

> The Supreme Court's decisions in *Berghuis* and *Davis* are not, however, a license for the police or the courts to override a suspect's clearly expressed request to remain silent. As the Court explained in *Berghuis*, when a suspect "simpl[y]" says he wants to remain silent or says he does not want to talk with the police, he has "invoked his right to cut off questioning." 560 U.S. at 382, 130 S.Ct. 2250 (internal quotation marks omitted). "[A] suspect need not 'speak with the discrimination of an Oxford don.'" *Davis*, 512 U.S. at 459, 114 S.Ct. 2350 (quoting *id.* at 476, 114 S.Ct. 2350 (Souter, J., concurring)). Rather, he need only "articulate his desire to [remain silent or] have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [such] a request." *Id.*

*Garcia v. Long*, 808 F.3d 771, 777 (9th Cir. 2015).

Once there is an unambiguous and unequivocal request by the suspect, "all questioning must cease," and it is improper for an officer to attempt to "clarify" the request. *See Smith v. Illinois*, 469 U.S. 91, 98 (1984) (per curiam). "Accordingly, if an officer seeks to clarify an unambiguous request and elicits an equivocal response, the suspect's postrequest statements 'may not be used to cast retrospective doubt on the clarity of the initial request itself.'" *Garcia*, 808

F.3d at 777 (quoting *Smith*, 469 U.S. at 100).

Three Ninth Circuit opinions have found that continued questioning by the police following an unambiguous statement by the suspect declining to talk violates *Miranda*. A *Miranda* violation was found in *Garcia*, where the *Miranda* rights were read to the suspect, the suspect responded that he understood them, the detective asked the suspect "Okay, now having that [i.e., your *Miranda* rights] in mind, do you wish to talk to me?" and the suspect's complete answer was "No." 808 F.3d at 774. The detectives pressed on and eventually the suspect began talking. *Id.* Another *Miranda* violation was found in *Jones v. Harrington*, 829 F.3d 1128 (9th Cir. 2016), when, "[a]fter hours of questioning, and little progress, [the suspect] finally told the officers 'I don't want to talk no more.' Undeterred, the officers continued questioning [the suspect], and eventually he made a number of incriminating statements." *Id.* at 113. Another *Miranda* violation was found in a case where "[d]espite clear and repeated invocations of his right to remain silent, the officer continued to question [the suspect] about the murder." *Anderson v. Terhune*, 516 F.3d 781, 785 (9th Cir. 2008). When the officer said the suspect was "'cryin' like a baby'" and "'you killed him for a good reason,'" the suspect responded, "'No way! No, way. I– You know what, I don't even wanna talk about this no more. We can talk about it later or whatever. I don't want to talk about this no more.'" *Id.* The officers continued with the interrogation and pressed on even after the suspect "unambiguously indicated that he wanted to end the interrogation by stating that he was 'through with this,' wanted to 'be taken into custody' and 'I plead the Fifth.'" *Id.* These cases declined to find ambiguity or equivocation in the suspect's plain statements of a desire not to talk.

In Mr. Mendoza's case, the facts show a *Miranda* violation, as they involved a similarly unambiguous invocation of the right to remain silent followed by continued police questioning. Indeed, his facts are extremely similar to those in *Garcia*.[7] Similar to *Garcia*, Mr. Mendoza gave

---

[7] *Garcia* affirmed the district court's decision to grant the writ. The Ninth Circuit found that the state court's decision that the "no" response was ambiguous and equivocal in light of prior and subsequent statements Garcia made during the interrogation was both contrary to, and an unreasonable application of, clearly established Supreme Court case law, and was based on an unreasonable determination of the facts. 808 F.3d at 776-77. Although the AEDPA does not apply to Mr. Mendoza's claim (because the state court never reached the merits of the claim),

1    a simple "no way" when asked if he wanted to talk to the police. Just as in *Garcia*, the police

2    continued questioning Mr. Mendoza -- despite his unambiguous statement that he did not want to

3    discuss anything with them -- and eventually elicited incriminating information from him. Unlike

4    in *Garcia*, the detectives did not ask any clarifying questions about Mr. Mendoza's "no way"

5    response. But that does not help Respondent because, even if the detectives had asked clarifying

6    questions, any postrequest statements by Mr. Mendoza could "'not be used to cast retrospective

7    doubt on the clarity of the initial request itself.'" *Garcia*, 808 F.3d at 777.

8          Respondent points to a state court case that stated that a defendant has not invoked his

9    right to remain silent "'when the defendant's statements were merely expressions of passing

10   frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular

11   subject covered by the questioning.'" Docket No. 25-1 at 24 (quoting *People v. Williams*, 49 Cal.

12   4th 405, 433-34 (Cal. 2010)). Even if that state court case is considered a correct statement of the

13   federal constitutional standard, Mr. Mendoza's statement was none of these things. His statement

14   was a simple and straightforward "no way" to the broad question of whether he wanted to "discuss

15   anything," and it was a statement made at the very outset of the interrogation, so it cannot

16   reasonably be understood to be passing frustration, animosity, or an effort to avoid a particular

17   topic.

18         Respondent argues that Mr. Mendoza impliedly waived his *Miranda* rights by answering

19   later questions. There was no implied waiver. Mr. Mendoza answered later questions only

20   because the detectives had ignored the "no way" response and continued with their questioning of

21   Mr. Mendoza. "'Under Miranda, the onus [is] not on [the suspect] to be persistent in [his] demand

22   to remain silent. Rather, the responsibility f[alls] to the law enforcement officers to scrupulously

23   respect [his] demand.'" *Jones*, 829 F.3d at 1141 (alterations in original) (quoting *United States v.

24   Lafferty*, 503 F.3d 293, 304 (3d Cir. 2007)). *Miranda* did not allow the detectives to simply ignore

25   the unequivocal and unambiguous answer Mr. Mendoza gave when asked if he wanted to "discuss

27   *Garcia*'s determination that the state court's rejection of the claim was unreasonable under
     AEDPA shows the obviousness of the error. In other words, it is not debatable that a "no" answer
28   to the question of whether the suspect wishes to speak to officers is an invocation of his *Miranda*
     right to remain silent.

anything." Even if one viewed the detectives' next question of "Do you wanna talk about why you're here?" as a clarifying question, that does not help Respondent because the earlier answer was not ambiguous or equivocal. *See Garcia*, 808 F.3d at 777 (quoting *Smith*, 469 U.S. at 100) ("if an officer seeks to clarify an unambiguous request and elicits an equivocal response, the suspect's postrequest statements 'may not be used to cast retrospective doubt on the clarity of the initial request itself'"). Moreover, "Do you wanna talk about why you're here?" did not seek to clarify the "no way" answer; instead it was an effort to get the suspect talking after he clearly declined.

Mr. Mendoza's *Miranda* rights were violated, and the later admission of his statement to the police was improperly admitted at trial as part of the prosecution's case-in-chief. Because *Miranda* offers a "bright-line" test for the admissibility of statements made in response to police interrogations, statements obtained in violation of *Miranda* must be excluded at a later trial. *See Jackson v. Giurbino*, 364 F.3d 1002, 1009-10 (9th Cir. 2004); *cf. Harris v. New York*, 401 U.S. 222, 225 (1971) (statements taken in violation of *Miranda* may be used to impeach the defendant's credibility, even though they are inadmissible as evidence of guilt). A constitutional violation occurred.

### b. The Error Was Not Harmless

On habeas review, a constitutional error is judged harmless if it does not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks and citation omitted). "Review for harmless error under *Brecht* is more forgiving to state court errors than the harmless error standard the Supreme Court applies on its direct review of state court convictions." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th. Cir. 2008) (internal quotation marks omitted).

If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995). If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse. *Id.* In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must

32

assume that the error is not harmless and the petitioner must prevail. *Id.* at 436, 438; *see, e.g., id.* at 436-44 (relief granted because record so evenly balanced that conscientious judge in grave doubt as to harmlessness of error); *Chambers v. McDaniel*, 549 F.3d 1191, 1200-01 (9th Cir. 2008) (granting habeas relief based upon "grave doubt" as to harmlessness of erroneous first-degree murder instruction on premeditation, where error went to "very heart of the case" and evidence against petitioner was not so great that it precluded a verdict of second-degree murder); *Alvarez v. Gomez*, 185 F.3d 995, 998-99 (9th Cir. 1999) (writ must be granted where recorded confessions were wrongly admitted and without them the facts of the case are in equipoise).

In a *Brecht* analysis of an improperly admitted confession, the question "is not whether the properly admitted evidence would have been sufficient; it is whether the improper evidence [e.g., the improperly admitted confession] had a substantial and injurious effect or influence on the jury." *Garcia*, 808 F.3d at 783; *see, e.g., id.* at 781-84 (admission of statements obtained in violation of *Miranda* was not harmless where victim's testimony of repeated sexual molestations was uncorroborated by physical evidence, the victim's grandmother's testified that defendant apologized for hurting the child but did not specify the ways he hurt her, and defense counsel conceded guilt on some charges only because the admission of the interrogation tape left him no other choice, and the confession was the focal point of prosecutor's closing argument); *Hurd v. Terhune*, 619 F.3d 1080, 1088, 1091 (9th Cir. 2010) (granting habeas relief where prosecution made extensive comments during opening statement and closing argument on petitioner's post-*Miranda* refusal to reenact the shooting of his wife during police interrogation, after petitioner had invoked his right to remain silent, as evidence of guilt, in violation of petitioner's *Miranda* rights, and the court could not say that the evidence did not substantially influence the jury); *Arnold v. Runnels*, 421 F.3d 859, 869 (9th Cir. 2005) (granting habeas relief where the prosecutor specifically emphasized in his opening statement and closing argument the petitioner's invocation of silence, which had been admitted at trial in violation of *Miranda*, and the court could not say that the evidence had no substantial influence upon the jury). The fact that the statements obtained in violation of *Miranda* might not have been a full confession sufficient to prove guilt does not necessarily mean that their admission was harmless error. *See Garcia*, 808 F.3d at 782-83

1  (improperly admitted statements were not harmless error because they were the focal point of the

2  prosecutor's argument, including extensive argument that the statements showed him flip-flopping

3  on key points).

4      In conducting that harmless error analysis, the habeas court does not look at the

5  defendant's trial testimony if that "testimony is induced by the erroneous admission of his out-of-

6  court confession into evidence as part of the government's case-in-chief." *Lujan v. Garcia,* 734

7  F.3d 917, 930 (9th Cir. 2013). Here, Mr. Mendoza's trial testimony is not considered because he

8  states that he testified only because of the confession. *See* Docket No. 2 at 27 (no competent

9  attorney would have called him to the stand if the interview had been ruled inadmissible); Docket

10  No. 13-3 at 24 (same).

11      The California Court of Appeal described his trial testimony:

12          Appellant testified in his own defense. He said that he arrived in the
United States in 2002 to work as a Tae Kwon Do instructor.
13          Appellant explained that Jane I had emotional problems and was
rebellious about maintaining a fighting weight. One time after
14          successfully weighing in, Jane I came over to him and kissed him on
the mouth. He said that it was the only time they kissed. Appellant
15          admitted that in November 2009, while he was discussing with Jane
I her readiness to compete, Jane I seemed affectionate so he grabbed
16          her by the shoulders and kissed her on the lips and "maybe her
breasts." Appellant said that he put his hand "inside of her pants."
17          Jane I closed her legs when his hand got close to Jane I's vagina.
Appellant said that he removed his hand and apologized. Jane I
18          appeared surprised, but not "bothered or worried." Appellant
admitted knowing that Jane I was 13 years old at the time he kissed
19          her mouth and breasts. He testified he believed Jane I wanted
attention at the time he kissed her.
20
            Appellant admitted helping Jane II with her stretching exercises, but
21          denied putting his hand in the area of her vagina while helping her
stretch. Further, he denied ever telling Jane III to touch his body.
22          Appellant said that he touched Jane III's shoulders, hands, and head
to get her attention.
23

24  Cal. Ct. App. Opinion at 6.

25      In addition to the trial testimony which he gave because of the admission of his confession

26  in his interview with the detectives, the interview itself was highly inculpatory. In the course of

27  the interview with the detectives, Mr. Mendoza admitted that: he touched Jane I once outside her

28  pants to check for her groin protector (Docket No. 25-23 at 47-48 (interview transcript at 18-19));

34

he touched her breasts intentionally (interview transcript at 23, 28); he felt a sexual attraction to her and knew it was wrong (*id.* at 29-30); he had a temptation to touch her (*id.* at 34); he kissed her on the nipple (*id.* at 45); he put his hand inside her underpants and gave a little massage to her vaginal area but did not insert his finger into her vagina (id. at 47-52); and "maybe" had a "little bit" of an erection while doing so (*id.* at 51).

The admission of the interview obtained in violation of Mr. Mendoza's *Miranda* rights was not harmless error. The most difficult piece of evidence that could be argued to have rendered the confession harmless in the analysis is the pretext call made the day before Mr. Mendoza was interviewed by the detectives. However, even when the pretext call is considered, the Court cannot conclude the *Miranda* violation was harmless error as to the convictions with regard to Jane II and Jane III.

The pretext call was made by Jane I and was limited to Mr. Mendoza's interactions with her. The pretext call apparently involved Jane I reading from a script provided by the police and trying to get Mr. Mendoza to be the first one to mention what exactly he did (as she mostly refers to their sexual encounter as "when you did it"), but he does not provide the words for what he did. Most of the call has confusing and ambiguous statements, largely due to Mr. Mendoza's mediocre English language skills and the fact that some of his apologies may be related to Jane I no longer attending his class.[8] However, at about the middle of the phone call, Mr. Mendoza appeared to admit that he touched her "privates" and thereafter it seems much clearer that they are talking about the sexual encounter she had reported. At page 6 of the transcript of the pretext call, the following exchange occurs:

> [Jane I]:      Like it bothered me is like no one ever touched my privates before, and like what did you think I would feel?
>
> Mendoza:      Uh, feel what?

---

[8] For example, at page 12 of the transcript, Jane I asks, "What do you remember doing to me?" Mendoza responds: "I don't remember anything (inaudible) I, I don't know. And I don't know, I don't remember. Sorry . . . and, and well, uh, I accepting that you're not coming to train and I, I (inaudible) again, and doing good and I kinda missed you, like I miss all my students that (inaudible) are in school yesterday doing very well in so many years. You train with me for four years and, and uh, I feel sad for that one, but, uh, I (inaudible) move on and go in life normally and wish you good luck, okay?" Docket No. 25-23 at 16 (ellipses in source).

> [Jane I]:  What did you think I would feel when you touched me?
> Did you think I'd be happy over it?
>
> Mendoza:  Me?  No.

Docket No. 25-23 at 10.  Mr. Mendoza expressed no outrage or even disagreement when he was being accused of sexual misconduct, e.g., when she says later in the call, "I feel like I'm not a virgin now.  You ruined my life," he says "no, it's nothing, nothing (inaudible).  I don't know what you thinking."  Docket No. 25-23 at 13 (transcript at 9).  Later still, when she asked, "Do you want to know what you did to me?  You put your hands down my pants and you touched me everywhere," he responded that he didn't remember and was sorry.  Docket No. 25-23 at 14 (transcript at 10).  The defense even conceded in its opening statement that Mr. Mendoza "made a mistake . . . one time" with Jane I.  RT 1533.  Given the damaging nature of Mr. Mendoza's reactions during the pretext call which, while somewhat ambiguous, appears to admit to touching Jane I's privates, the Court concludes that the admission of the confession did not have a substantial and injurious effect as to the convictions involving Jane I, i.e., Counts 1-5.

However, the pretext call does not stand on the same footing with respect to the other two complainants (Jane II and Jane III) because nothing in the pretext call concerned them directly.  It is true that the jury was given a propensity instruction, i.e., the jury was instructed that, if it concluded Mr. Mendoza had committed a sexual offense against one of the girls the jury could conclude that he was likely to have committed and did commit the offenses against the other girls.[9]  But that propensity instruction was permissive, not mandatory; that is, the jury was not required to find him guilty as to the other two girls even if it found him guilty as to Jane I.  The crimes alleged were somewhat different, even though they all were sexual offenses against minors,

---

[9]  The jury was instructed: "If you conclude by at least a preponderance of the evidence that the defendant committed one or more of the sexual offenses charged in this case, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit any of the other sexual offenses charged here.  Do not consider this evidence for any other purpose.  Such a conclusion is only one factor to consider along with all the other evidence.  Your conclusion that the defendant committed one or more of the charged offenses is not sufficient by itself to prove that the defendant is guilty of any other charged offense.  The People must still prove each charge and allegation beyond a reasonable doubt."  CT 336-37 (CALCRIM No. 1191).

United States District Court
For the Northern District of California

and a jury might have been less apt to use the crimes against Jane I as propensity evidence for the crimes against Jane II and Jane III. Some of the circumstances surrounding their reports of lewd conduct made the charges with regard to Jane II and Jane III less strong than the charges against Jane I.

The charged crimes with regard to Jane II all involved Mr. Mendoza allegedly touching her vaginal area and breasts over her clothing while they were in a very public place with other children and adults nearby. Jane II testified that the touching occurred next to a pillar in the Tae Kwon Do studio while other people were in the studio. This apparently was within view of other people, as she testified that she tried to make eye contact with other people while being touched and some students testified that they could see all the other students in the studio by looking at them directly or in the mirrors on the studio's walls. No witness other than Jane II testified to seeing this touching. The jury may have been skeptical that this touching could have ~~gone~~ occurred with the adults (including especially her mother) not noticing and expressing concern with the Tae Kwon Do instructor putting his hand on a girl's vaginal area and breasts on numerous occasions. Those circumstances made for a less strong case with regard to the charges involving Jane II.

The charged crimes with regard to Jane III all involved conduct against a 4-year-old as recalled by the victim when she was a 9-year-old. Her very young age plus the time lapse might have led the jury to have more doubt about her ability to recall things accurately. Additionally, Jane III testified that the sexual abuse occurred at night in Mr. Mendoza's bedroom, whereas his wife denied that he ever brought Jane III into the bedroom she shared with Mr. Mendoza. Jane III also had not reported being touched by Mr. Mendoza until her mother had introduced the topic and had her see two different counselors. *See* RT 1853, 1862-67. One of the counselors introduced her to some of the terminology Jane III used at trial, i.e., the counselor had first told Jane III of the term "played with himself," RT 1864, and that might have led a jury to wonder what other ideas had been placed in Jane III's mind by adults trying to help her. Those circumstances made for less strong cases with regard to the charges involving Jane III.

The evidence could be seen by jurors as weakened by the fact that the victims had all

37

delayed in their reporting of the sexual abuse.  Jane I delayed for about 1-2 years.  Jane II delayed

for about 2 years.  Jane III delayed about 5 years in reporting and was purporting to recall events

that had happened when she was about 4 years old.  Although CSAAS *expert* testimony often is

used to explain a delay in reporting as being not inconsistent with the sexual abuse having

occurred, there was no such expert testimony here.  Detective Meroney was not qualified as an

expert and gave only anecdotal evidence that, in her experiences, some victims delay reporting and

some victims do not delay reporting.  This lacked the impact that real CSAAS expert testimony

would have had.  Typically, a CSAAS expert will testify that children who have been sexually

abused may delay in reporting that abuse and that testimony is used to rehabilitate the child-

witness' credibility when the defendant suggests that the delayed reporting is inconsistent with the

child's claim of being molested.  *See* Cal. Ct. App. Opinion at 12. Because there was no CSAAS

expert testimony, the accompanying jury instruction was not given.  *See* CALCRIM No. 1193

("You may consider this evidence only in deciding whether or not <insert name of alleged victim

of abuse> conduct was not inconsistent with the conduct of someone who has been molested, and

in evaluating the believability of (his/her) testimony.")  Even if jurors might have given little

weight to the delay based on their own understanding of these circumstances, the delayed

reporting did not help the credibility of the victims, and may have led some jurors to harbor some

doubt about the accuracy of their testimony.

Moreover, there was no physical evidence corroborating the victims' reports of sexual

abuse.  That is, none had a physical examination that yielded any finding suggestive of sexual

abuse.  This is not surprising given the nature of the reported sexual abuse.  The absence of

physical findings to corroborate the reports of sexual abuse may have led some jurors to be less

willing to convict.

In contrast to the above evidence which was contested or arguably ambiguous, the

confession was far more damaging because it was much more graphic and contained many direct

admissions by Mr. Mendoza.  As noted above, in the course of the interview with the detectives,

Mr. Mendoza admitted that: he touched Jane I once outside her pants to check for her groin

protector (Docket No. 25-23 at 47-48 (interview transcript at 18-19)); he touched her breasts

38

intentionally (interview transcript at 23, 28); he felt a sexual attraction to her and knew it was wrong (*id.* at 29-30); he had a temptation to touch her (*id.* at 34); he kissed her on the nipple (*id.* at 45); he put his hand inside her underpants and gave a little massage to her vaginal area but did not insert his finger into her vagina (id. at 47-52); and "maybe" had a "little bit" of an erection while doing so (*id.* at 51).

Any doubt that this defendant was the sort of adult who would prey on little girls was likely eliminated once the jury heard the damaging interview with the detectives. And once the jury saw that this was the sort of adult who felt a sexual attraction to a 12-year-old and acted on it, the jury probably would have believed the other girls' accusations against him despite his denial. "A confession is like no other evidence" – it may be "the most . . . damaging evidence that can be admitted" against a defendant. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks omitted). That was certainly the case here.

The prosecutor greatly emphasized the confession in her closing argument. RT 2779-81, 2782, 2784, 2823, 2825-26. The prosecutor reminded the jury they could access the interview "as many times as you need to." RT 2775. And the prosecutor pointed out inconsistencies between Mr. Mendoza's statements to police and his trial testimony – neither of which would have been before the jury if the interview had been suppressed due to the *Miranda* violation. *See* RT 2782, 2827-28, 2831.

For these reasons, the Court concludes that the admission of the interview obtained in violation of Mr. Mendoza's *Miranda* rights had a substantial and injurious effect on the jury's verdict with respect to the convictions for conduct against Jane II (Counts 6-8) and Jane III (Counts 9-11).

Both trial counsel and appellate counsel engaged in "deficient performance," *Strickland*, 466 U.S. at 687-88, by failing to present the meritorious *Miranda* claim. It fell below an objective standard of reasonableness under prevailing professional norms not to present a *Miranda* claim that was plain from the first few sentences of the interview transcript available to them. Prejudice resulted from their failure to present this meritorious *Miranda* claim in the state courts   There is a reasonable probability that, but for trial counsel's unprofessional errors, the trial court would have

39

1   suppressed the interview and an acquittal on the charges pertaining to Jane II and Jane III would

2   have occurred.  There is a reasonable probability that, but for appellate counsel's failure to present

3   the claim on appeal, Mr. Mendoza would have prevailed on appeal.  Mr. Mendoza thus has shown

4   ineffective assistance of counsel that provides cause to excuse his procedural default.  *See Murray*

5   *v. Carrier*, 477 U.S. at 488.

6        The petitioner seeking to avoid a procedural default also must show actual prejudice.  Mr.

7   Mendoza also shows actual prejudice resulting from the failure to raise the *Miranda* claim; the

8   interview was admitted at trial as a result of trial counsel's failure to challenge the admission of

9   the interview obtained in violation of his *Miranda* rights, and the state appellate court did not

10   consider this meritorious grounds for reversal as a result of appellate counsel's failure to raise it on

11   appeal.  As discussed above, the admission of the interview at trial "worked to his *actual* and

12   substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United*

13   *States v. Frady*, 456 U.S. 152, 170 (1982).  The claim that a *Miranda* violation occurred (Claim

14   1(a)) therefore is not barred by the procedural default doctrine and may be considered on the

15   merits.

16            c.    *Brady* Claim

17        Mr. Mendoza contends that the State suppressed the portion of the interview in which he

18   responded to the *Miranda* warning.  Docket No. 2 at 18.  He also alleges that the State "edited

19   [out] from the pretrial statements the coercive rants from the male officer against petitioner's

20   invocation(s) that he did NOT wish to speak to them."  Docket No. 2 at 20 (brackets in source).

21   Mr. Mendoza declares that, after he stated that he did not want to speak to the officers, "[t]he male

22   officer exploded, telling me that I had to tell the truth, that I have to take responsibility."  Docket

23   No. 2 at 71.

24        Both the transcript and the recorded interview directly contradict Mr. Mendoza's assertion

25   that the male officer engaged in "coercive rants."  Although the recording does not have a time-

26   stamp on it, it does not appear to have been edited in any way.  There is no mention of any

27   *Miranda* right or desire for counsel or to remain silent, other than the *Miranda* advisement (and

28   Mr. Mendoza's statement that he does not want to discuss anything) in the first couple of pages of

the transcript.  The video recording plainly shows that no one ever raised his or her voice, and all three participants (i.e., Mr. Mendoza, Detective Anderson, and Detective Meroney) remained seated throughout the interview in approximately the same positions for the duration of the interview, other than the detectives stepping out of the room a few times.[10]  The body language of the participants in the video is wholly inconsistent with Mr. Mendoza's assertion that either detective "exploded" or engaged in "coercive rants."  As the interview progressed, Detective Anderson encouraged Mr. Mendoza to take responsibility and to be truthful, but not as part of any sort of coercive rant.  The detectives' words and mannerisms appear designed to calm Mr. Mendoza down so he would open up and talk.  The detectives had calm and even demeanors. They suggested that perhaps Mr. Mendoza had made a mistake with Jane I and that his behavior with Jane I might be understandable.  There was no yelling.  There were no scare tactics.  The video recording undermines Mr. Mendoza's ability to show overreaching by the detectives, other than their failure to stop questioning him after he stated at the outset that he did not want to discuss anything.

Defense counsel had at least the recording before trial.  At a pretrial conference, both the prosecutor and defense counsel stated that they had prepared transcripts from the recordings of the pretext call and the interview with police, and planned to exchange those transcripts in order to resolve any differences.  RT 350-51.

Trial counsel (and later appellate counsel) had the video recording which had no indication of having been tampered with and was completely at odds with Mr. Mendoza's reports of coercive rants and deleted requests for counsel.

With that evidence in hand, neither trial counsel nor appellate counsel engaged in "deficient performance," *Strickland*, 466 U.S. at 687-88, in not presenting the *Brady* claim because the claim appeared patently meritless.  Counsel had no duty to make a meritless motion or present a meritless issue on appeal, *see Juan H.*, 408 F.3d at 1273; *Rupe*, 93 F.3d at 1445;

[10] Detective Meroney steps out of the room for about a minute at page 21 (at minutes 7:00-8:21 in segment 3).  Detective Meroney steps out of the room for about a minute at page 63 (at minutes 2:00-3:05 in segment 6).  Detective Anderson leaves the room for about six minutes at pages 66-74 (at minutes 5:00-11:20 in segment 6.

*Moormann*, 628 F.3d at 1107.  Mr. Mendoza thus has not shown ineffective assistance of counsel

that provides cause to excuse his procedural default.  *See Murray v. Carrier*, 477 U.S. at 488.  The

claim that a *Brady* violation occurred (i.e., Claim 1(b)) therefore is procedurally defaulted and is

now dismissed.

     d. <u>Right-To-Present-A-Defense Claim</u>

   Mr. Mendoza also contends that he was denied his rights to present a defense and to cross-

examine a witness when the trial court overruled defense counsel's objection to Detective

Meroney testifying as an expert and denied a motion for a continuance so the defense could

investigate her expertise.  Docket No. 2 at 3, 32.

   Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the

more general Fifth or Fourteenth Amendment guarantee of due process, "the Constitution

guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes

v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690

(1986)); *see California v. Trombetta*, 467 U.S. 479, 485 (1984) (due process); *Chambers v.

Mississippi*, 410 U.S. 284, 294 (1973) (compulsory process).  The right to present a defense is

usually implicated by a restriction on the defendant's presentation of his case or a restriction on

the defendant's efforts to challenge the prosecution's case.

   Contrary to Mr. Mendoza's assumption, the trial court did not qualify Detective Meroney

to be an expert in child sexual assault cases.  After the Evidence Code 402 hearing, the trial court

determined that Detective Meroney would not be permitted to testify as an expert on CSAAS or as

an expert on anything else.  *See* RT 1235-36.  Mr. Mendoza suffered no denial of his right to

present a defense or to cross-examine the witness about her expertise because the trial court

refused to qualify Detective Meroney as an expert.  Likewise, no continuance was necessary to

prepare for a late-designated expert witness because Detective Meroney was not allowed to testify

as an expert.  (She was an investigating detective, so the defense had long known of her.  And she

had been on the original witness list as a regular witness, so the defense already knew that she

would be testifying as a police detective.  CT 97.)  As mentioned earlier in this order, Detective

Meroney did testify about commonalities she had observed in her experience, but her testimony

1    was based on her own experience and did not purport to be testimony based on her expertise or

2    any special training.

3          Neither trial counsel nor appellate counsel engaged in "deficient performance," *Strickland*,

4    466 U.S. at 687-88, in not presenting the claim that Mr. Mendoza's right to present a defense was

5    violated.  The claim was meritless, and counsel had no duty to make a meritless motion or present

6    a meritless issue on appeal.  Mr. Mendoza thus has not shown ineffective assistance of counsel

7    that provides cause to excuse his procedural default.  *See Murray v. Carrier*, 477 U.S. at 488.  The

8    claim that his right to present a defense was violated (i.e., Claim 3) therefore is procedurally

9    defaulted and is now dismissed.

10         The foregoing section has been focused on whether the claims are procedurally defaulted.

11   The Court has concluded that only the *Miranda* claim and the related ineffective assistance of

12   counsel claim are not barred by the procedural default doctrine.  Those must be considered on the

13   merits, although it is for the most part the same analysis.

14   E.    The *Miranda* Claim (Claim 1(a))

15         For the reasons stated in Section D.2.a, Mr. Mendoza is entitled to relief on his claim that

16   there was a *Miranda* violation.  Mr. Mendoza's *Miranda* rights were violated when the detectives

17   continued to interview him after he unequivocally and unambiguously told them that he did not

18   want to discuss anything with them.  The admission of that interview at trial was an error.  As

19   explained at length above, the error was not harmless.

20   F.    Ineffective Assistance of Trial Counsel Claim (Claim 2)

21         For the reasons stated in Section D.2.a, Mr. Mendoza is entitled to relief on his claim that

22   trial counsel provided ineffective assistance of counsel in failing to investigate and challenge the

23   admission of the police station interview on the ground that Mr. Mendoza's *Miranda* rights were

24   violated.  Counsel fell below an "objective standard of reasonableness under prevailing

25   professional norms in not investigating and presenting the meritorious *Miranda* claim.  *Strickland*,

26   466 U.S. at 687-88.  There also is a reasonable probability that, if counsel had moved to suppress

27   the interview, the interview would not have been heard by the jury and the result of the trial would

28   have been different.

43

G.    Ineffective Assistance of Appellate Counsel Claim (Claim 4)

Mr. Mendoza argues that appellate counsel was ineffective in that she failed to raise on direct appeal the arguments that (a) the pretrial interview with police should have been excluded because Mr. Mendoza's *Miranda* rights were violated, and (b) trial counsel provided ineffective assistance of counsel in failing to investigate and challenge the admission of the interview with the detectives.

This claim for ineffective assistance of appellate counsel was presented for the first time in Mr. Mendoza's *pro se* petition for writ of habeas corpus in the California state courts.  Unlike the *Miranda* claim and the claim for ineffective assistance of trial counsel, this claim does not have a procedural default concern because ineffective assistance of appellate counsel could not be presented on the direct appeal.

The Monterey County Superior Court correctly articulated the familiar standard from *Strickland*.  That court then applied the *Strickland* standard with this analysis:

> Here, petitioner faults appellate counsel for failing to raise the aforementioned claims on appeal.  However, petitioner fails to provide trial transcripts or other evidence through which the court could determine the merit of his contentions, instead supporting his arguments entirely with his own declarations.  Appellate counsel does not violate a defendant's right to effective counsel merely by refusing to follow a defendant's desired legal strategy.
>
> Moreover, even without the testimony and evidence that petitioner contends should not have been admitted (i.e., the confession, expert testimony, and his testimony), the testimony of the three victims was sufficient to support the basis of his convictions.  In short, petitioner has failed to show a reasonable probability that the outcome of the trial would have been different but for any arguably deficient performance from his attorneys.

Docket No. 2 at 64.

As the last reasoned decision from a state court, the Monterey County Superior Court's decision is the decision to which § 2254(d) is applied.  *See Ylst*, 501 U.S. at 803-04; *Barker*, 423 F.3d at 1091-92.  Mr. Mendoza is entitled to habeas relief only if that court's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

44

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland*, 466 U.S. 668. A defendant must show that appellate counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 & n.9 (9th Cir. 1989). Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See Miller*, 882 F.2d at 1434; *see also Jones*, 463 U.S. at 751-52.

The Monterey County Superior Court's rejection of Mr. Mendoza's claim for ineffective assistance of appellate counsel was an unreasonable application of *Strickland*'s prejudice prong. The superior court correctly articulated *Strickland*'s requirement that the petitioner must show a reasonable probability that the outcome of the proceedings would have been different but for counsel's error. But then the superior court unreasonably applied that standard by conflating it with a sufficiency of the evidence test. The superior court explained that *Strickland*'s prejudice prong had not been satisfied because, "even without the testimony and evidence that petitioner contends should not have been admitted (i.e., the confession, expert testimony, and his testimony), the *testimony of the three victims was sufficient to support the basis of his convictions*." Docket No. 2 at 64 (emphasis added). But as noted above, the prejudice prong of *Strickland* is not defeated simply by a showing that there was sufficient evidence to convict; the proper inquiry is whether there is a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010).

The state court's conflation of the standards is an unreasonable application of *Strickland*. *Crace v. Herzog*, 798 F.3d 840, 849 (9th Cir. 2015). In *Crace*, the Washington Supreme Court had determined that no prejudice could result from a defense attorney's failure to request a lesser-included-offense instruction as long as there was sufficient evidence to support the verdict. *Id.* at

45

849.  The Ninth Circuit determined that such an approach was wrong, and resulted in the

deference under § 2254(d) not being accorded the state court decision.

> The Washington Supreme Court in essence converted *Strickland*'s prejudice inquiry into a sufficiency-of-the-evidence question—an entirely different inquiry separately prescribed by *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This is so because, under the Washington Supreme Court's approach, a defendant can only show *Strickland* prejudice when the evidence is insufficient to support the jury's verdict—a circumstance in which the defendant does not need to rely on *Strickland* at all because *Jackson* already provides a basis for habeas relief.  *See id.* (a petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt").  And conversely, if the evidence is sufficient to support the verdict, there is categorically no *Strickland* error, according to the Washington Supreme Court's logic.  By reducing the question to sufficiency of the evidence, the Washington Supreme Court has focused on the wrong question here—one that has nothing to do with *Strickland*.

*Crace*, 798 F.3d at 849.  *See also Saranchak v. Sec'y Pa. Dep't of Corr.*, 802 F.3d 579, 599 (3d

Cir. 2015) ("*Strickland* prejudice does not depend on the sufficiency of the evidence despite

counsel's mistakes"); *Tice v. Johnson*, 647 F.3d 87, 110 (4th Cir. 2011) ("The familiar

sufficiency-of-the-evidence analysis centering on whether a reasonable jury could have convicted

an adequately represented defendant is considerably more deferential than the *Strickland* test for

prejudice in an ineffective-assistance case, which seeks only to discover whether the absence of

error would have given rise to a reasonable probability of acquittal, such that confidence in the

verdict is undermined.")

Because the Monterey County Superior Court unreasonably applied *Strickland* by treating

it as only a question of whether the evidence was sufficient without the improperly admitted

evidence, that court's decision is not entitled to the deference normally accorded by 28 U.S.C. §

2254(d) to a state court decision.[11]  That is not the end of the inquiry, as the petitioner must still

---

[11] In the procedural default section earlier in this order, the Court evaluated the ineffectiveness of appellate counsel using a de novo standard because AEDPA deference is not applied in evaluating ineffectiveness of counsel to determine whether there is cause to excuse the procedural default. *See* footnote 6 and accompanying text.  In the present section, where the Court is evaluating the merits of the claim, the Court starts off with the assumption that AEDPA deference would apply, but then determines that AEDPA deference does not apply to the merits of the claim of ineffective assistance of appellate counsel because the state court's decision was an unreasonable application of *Strickland*.

show a constitutional violation in order to obtain federal habeas relief.  For the reasons discussed in Section D.2.a, the Court concludes that appellate counsel provided ineffective assistance by failing to assert on direct appeal the meritorious claim that the interview should have been suppressed due to the *Miranda* violation and that trial counsel provided ineffective assistance in failing to move to suppress that interview.  Also for the reasons discussed in Section D.2.a, there is a reasonable probability that, had counsel raised these issues on appeal, Mr. Mendoza would have prevailed on appeal.  Due to the meritorious nature of both the *Miranda* claim and the claim that trial counsel failed to present the *Miranda* claim, these were not the sort of claims that would have been weeded out by competent appellate counsel in assembling the issues on appeal.  Mr. Mendoza is entitled to the writ on this claim.

H.    No Certificate Of Appealability On Rejected Claims

As to those claims on which the Court has denied habeas relief, a certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of [those] constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is DENIED for those claims on which the Court has denied habeas relief.

## VI.    CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **GRANTED IN PART AND DENIED IN PART.**  The petition is granted with respect to the convictions in Counts 6-11 (i.e., the charges based on conduct against Jane II and Jane III).  Those convictions are now vacated.  Within ninety days from the date of this order, the State of California must re-institute criminal proceedings on those charges against Mr. Mendoza or seek resentencing in light of the convictions on Counts 6-11 having been vacated.  The petition is denied in all other respects.

///

///

///

///

///

47

1  The Clerk shall mail a copy of this order to the Monterey County Public Defender's

2  Office.  The Public Defender's office is requested to contact Mr. Mendoza and to discuss with him

3  the steps he needs to take to obtain counsel.  This Court is not appointing counsel for Mr.

4  Mendoza and instead merely asks that the public defender contact Mr. Mendoza.

5      The Clerk shall close the file.

6

7      **IT IS SO ORDERED**.

8

9  Dated: January 22, 2018

10  _____

11  EDWARD M. CHEN
    United States District Judge